Rebecca Marrero Gebman
2 Wilson Street, Beacon NY 12508
rgebman@[...].com (646)373-3001

June 23, 2017

Hon. Cathy Seibel
United States District Judge
The Hon. Charles L. Brient Jr.
Federal Building and United States Courthouse
300 Quarropas Street
White Plains, NY 10601-4150

RE: U.S. Bank Trust, N.A., against Rebecca Marrero Gebman, et al
16-CV-07033 (CS)

Dear Hon. Cathy Seibel:

Response to ORDER TO SHOW CAUSE: Dated June 12, 2017.

The Court failed to note on April 12, 2017that I was the only party physically present in the Courtroom prepared to discuss the merits of this case. The Courts directive was followed by new Counsel for BoA asking to file a late Answer to which the Court was informed I was opposed. The Court failed to indicate that it would entertain my objection, rather a a Pre-Motion Conference new Counsel unprepared to address the first BoA's Counsel afforded BoA the right to file its Motion did not direct me to file a response to which the Court granted the letter Motion and the Court did not afford me the time to opposed new Counsels Answer delivered two days before what I understood was the former new Conference Date.

The Court has erred in the cadence of its activity and in doing so has denied me due process in a matter clearly requires BoA presence in the Courtroom and before my opposition to BoA Motion served two days prior to what was a constructively cancelled appearance on June 5, 2017 to which in the Court's view I was in error for not appearing to which I offer my apologies to the Court.

This omission on my part is no less impactful by the constructive non-appearance of Counsel on April 12, 2017.

<u>A SETTLEMENT IS NOW POSSIBLE</u>:

1). REBECCA MARRERO GEBMAN is of the information and belief that the press release from the UNITED STATES DEPARTMENT OF JUSTICE see Exhibit 1, asserts consumer rights agreed to by BANK OF AMERICA (BOA) not otherwise disclosed by BANK OF AMERICA (BOA) (including subsidies and assignee's) or CALIBER HOME LOANS (CHL) in the moving papers in this matter.

1

2). RMG asserts BOA has agreed to proffer certain relief to affected recipients of certain financial products among these being first mortgages, second mortgages, home equity and modified mortgages of which define the entire nature of financial relationship activities between the parties in this matter and those of REAL TIME RESOLUTIONS not currently a party in this matter who has offered to accept $38,473.30 payment by August 6, 2017. Upon the offer to finance such payment Bank America then would render all matters alleged herein moot.

3) Caliber Home Loans willingness to add such arrears to the lien at issue would cause all matters herein to be moot. Lacking such accommodation from Caliber, BOA willingness to combine all sums due and owing to Caliber to the REAL TIMES RESOLUTIONS debt retirement offer at a term of 20 years in the form of a second mortgage at a rate similar to the first mortgage as per the publically stated intent of the DOJ/NYS/BA Settlement would resolve all issues. Should the Court determine BOA is entitled to additional collateral such collateral may be made available in the form of a blanket mortgage. Given the forgoing it is possible BOA alleged default as to the SETTLEMENT AGREEMENT (SA) in Exhibit 2 would be moot.

4). RMG is of the information and belief that the Settlement fully attached a s Exhibit 2, indicates a that the loans made by BOA now the subject matter of the Complaint by Caliber Home Loans and by RMG against BOA, are by reference and public acclamation subject to the document(s) in Exhibit 2, and it is only reasonable that the holders of rights to these loans acknowledge or deny that these financial instruments are covered under the Settlement Agreement.

5) As for deceptive practice as defined under NYS 349 General Business Law, the fact that BOA, DOJ and the New York State Attorney General have agreed to a course of action and publicized such Consumer relief indicated the public including myself, has a right to the discovery of all communication between BOA, Caliber and myself as to the financial products at issue. In doing so it will become apparent BOA in selling said financial instruments at issue was a dodge of BOA's obligations under the SA, as publically represented by the last two Attorney Generals of the U.S. See DEAL BOOK NEW YORK TIMES August 21, 2014 ERIC HOLDER, US ATTORNEY GENERAL, occurring constructively at the time of incipient default of the CHL debt:

> "Still, government authorities, in announcing the settlement on Thursday, put emphasis on the aid that will come to borrowers. Attorney General <u>Eric H. Holder Jr.</u> led a news conference that was attended by such a large group of investigators from around the country that there was masking tape on the stage to show them where to stand."

5). The following direct citations from DOJ Press Release as presented establish a certain duty by BOA and Caliber Home Loans as the public proclamation as to DOJ, BOA and the New York State Attorney General follows constructively the entire time of payments at issue and is constructively in effect until 2018 as defined in the body of the Press Release quoted below as such Statute of Limitations cannot be claimed to have toiled as the violation of law occurred

2

when BOA obfuscated its responsibilities under the DOJ advertised relief upon I at all times have been reliant.

6) Germaine passages of the August 21, 2014 DOJ press release in Exhibit 1 is as follows:

> "As part of this global resolution, the bank has agreed to pay a $5 billion penalty under the Financial Institutions Reform, Recovery and Enforcement Act (FIRREA) – the largest FIRREA penalty ever – and provide billions of dollars of relief to struggling homeowners, including funds that will help defray tax liability as a result of mortgage modification, forbearance or forgiveness."

> "This historic resolution - the largest such settlement on record - goes far beyond 'the cost of doing business,'" said Attorney General Holder. "Under the terms of this settlement, the bank has agreed to pay $7 billion in relief to struggling homeowners, borrowers and communities affected by the bank's conduct. This is appropriate given the size and scope of the wrongdoing at issue."

> "At nearly $17 billion, today's resolution with Bank of America is the largest the department has ever reached with a single entity in American history," said Associate Attorney General West. "But the significance of this settlement lies not just in its size; this agreement is notable because it achieves real accountability for the American people and helps to rectify the harm caused by Bank of America's conduct through a $7 billion consumer relief package that could benefit hundreds of thousands of Americans still struggling to pull themselves out from under the weight of the financial crisis."

> "The Justice Department and the bank settled several of the department's ongoing civil investigations related to the packaging, marketing, sale, arrangement, structuring and issuance of RMBS, collateralized debt obligations (CDOs), and the bank's practices concerning the underwriting and origination of mortgage loans. The settlement includes a statement of facts, in which the bank has acknowledged that it sold billions of dollars of RMBS without disclosing to investors key facts about the quality of the securitized loans. When the RMBS collapsed, investors, including federally insured financial institutions, suffered billions of dollars in losses. The bank has also conceded that it originated risky mortgage loans and made misrepresentations about the quality of those loans to Fannie Mae, Freddie Mac and the Federal Housing Administration (FHA)."

> "Of the record-breaking $16.65 billion resolution, almost $10 billion will be paid to settle federal and state civil claims by various entities related to RMBS, CDOs and other types of fraud. Bank of America will pay a $5 billion civil penalty to settle the Justice Department claims under FIRREA. ...$75 million to settle claims by the state of Maryland, and $300 million to settle claims by the state of New York."

> "Bank of America will provide the remaining $7 billion in the form of relief to aid hundreds of thousands of consumers harmed by the financial crisis precipitated by the unlawful conduct of Bank of America, Merrill Lynch and Countrywide. That relief will take various forms, including principal reduction loan modifications that result in numerous homeowners no longer being underwater on their mortgages and finally having substantial equity in their homes. It will also include new loans to credit worthy borrowers struggling to get a loan, donations to assist communities in recovering from the financial crisis, and financing for affordable rental housing. Finally, Bank of America has agreed to place over $490 million in a tax relief fund to be used to help defray some of the tax liability that will be incurred by consumers receiving certain types of relief if Congress fails to extend the tax relief coverage of the Mortgage Forgiveness Debt Relief Act of 2007."

> "An independent monitor will be appointed to determine whether Bank of America is satisfying its obligations. If Bank of America fails to live up to its agreement by Aug. 31, 2018, it must pay liquidated damages"

3

"The U.S. Attorney's Office for the Southern District of New York, along with the Federal Housing Finance Agency's Office of Inspector General and the Special Inspector General for the Troubled Asset Relief Program, conducted investigations into the origination of defective residential mortgage loans by Countrywide's Consumer Markets Division and Bank of America's Retail Lending Division as well as the fraudulent sale of such loans to the government sponsored enterprises Fannie Mae and Freddie Mac (the "GSEs"). The investigation into these practices, as well as three private whistleblower lawsuits filed under seal pursuant to the False Claims Act, are resolved in connection with this settlement. As part of the settlement, Countrywide and Bank of America have agreed to pay $1 billion to resolve their liability under the False Claims Act. The FIRREA penalty to be paid by Bank of America as part of the settlement also resolves the government's claims against Bank of America and Countrywide under FIRREA for loans fraudulently sold to Fannie Mae and Freddie Mac. In addition, Countrywide and Bank of America made admissions concerning their conduct, including that they were aware that many of the residential mortgage loans they had made to borrowers were defective, that many of the representations and warranties they made to the GSEs about the quality of the loans were inaccurate, and that they did not self-report to the GSEs mortgage loans they had internally identified as defective."

"For years, Countrywide and Bank of America unloaded toxic mortgage loans on the government sponsored enterprises Fannie Mae and Freddie Mac with false representations that the loans were quality investments," said U.S. Attorney Preet Bharara for the Southern District of New York. "This office has already obtained a jury verdict of fraud and a judgment for over a billion dollars against Countrywide and Bank of America for engaging in similar conduct. Now, this settlement, which requires the bank to pay another billion dollars for false statements to the GSEs, continues to send a clear message to Wall Street that mortgage fraud cannot be a cost of doing business."

"The U.S. Attorney's Office for the Eastern District of New York, together with its partners from the Department of Housing and Urban Development (HUD), conducted a two-year investigation into whether Bank of America knowingly made loans insured by the FHA in violation of applicable underwriting guidelines. The investigation established that the bank caused the FHA to insure loans that were not eligible for FHA mortgage insurance. As a result, HUD incurred hundreds of millions of dollars of losses. Moreover, many of Bank of America's borrowers have defaulted on their FHA mortgage loans and have either lost or are in the process of losing their homes to foreclosure."

"As a Direct Endorser of FHA insured loans, Bank of America performs a critical role in home lending," said U.S. Attorney Loretta E. Lynch for the Eastern District of New York. "It is a gatekeeper entrusted with the authority to commit government funds earmarked for facilitating mortgage lending to first-time and low-income homebuyers, senior citizen homeowners and others seeking or owning homes throughout the nation, including many who live in the Eastern District of New York. In obtaining a payment of $800 million and sweeping relief for troubled homeowners, we have not just secured a meaningful remedy for the bank's conduct, but have sent a powerful message of deterrence."

"Today's settlement with Bank of America is another important step in the Obama Administration's efforts to provide relief to American homeowners who were hurt during the housing crisis," said U.S. Department of Housing and Urban Development (HUD) Secretary Julián Castro. "This global settlement will strengthen the FHA fund and Ginnie Mae, and it will provide $7 billion in consumer relief with a focus on helping borrowers in areas that were the hardest hit during the crisis. HUD will continue working with the Department of Justice, state attorneys general, and other partners to take appropriate action to hold financial institutions accountable and provide consumers with the relief they need to stay in their homes. HUD remains committed to solidifying the housing recovery and creating more opportunities for Americans to succeed."

"Bank of America and the banks it bought securitized billions of dollars of defective mortgages," said Acting Inspector General Michael P. Stephens of the FHFA-OIG. "Investors, including Fannie Mae and Freddie Mac, suffered enormous losses by purchasing RMBS from Bank of America, Countrywide and Merrill Lynch not knowing about those defects. Today's settlement is a significant, but by no means final step by FHFA-OIG and its law enforcement partners to hold accountable those who committed acts of fraud and deceit."

"The attorneys general of California, Delaware, Illinois, Kentucky, Maryland and New York also conducted related investigations that were critical to bringing about this settlement. In addition, the settlement resolves investigations conducted by the Securities and Exchange Commission (SEC) and litigation filed by the Federal Deposit Insurance Company (FDIC)."

6) See attached Exhibit 2: Therein the consumer relief publically stated to be afforded is not a contestable fact and baring settlement discovery is required as a matter of law as to what is alledged to be desecptive acts of BOA and COL and is not bared from action as to STATUTE OF LIMITATIONS as the SA is operative until 2018.
Settlement Agreement
Annex 1 - Statement of Facts
Annex 2 - Consumer Relief
Annex 2 - Exhibit 1 - Loan List
Annex 2 - Exhibit 2 - Model VA Agreement
Annex 3 - Tax Fund
Annex 4 - Transaction List
Exhibit A--FDIC
Exhibit B - SEC Bank of America Settlement Documents
**Component(s):**
Office of the Attorney General
**Press Release Number:**
14-884
*Updated October 8, 2014*

7) In Annex 1-Statement of Facts in the SA, the following is stated and applicable to all circumstances at issue as to the financial instruments at issue.

> "Between 2005 and 2007, Countrywide Financial Corporation ("CFC") was the parent corporation of Countrywide Home Loans ("CHL"), Countrywide Bank, FSB ("CB"), and Countrywide Securities Corporation ("CSC"). CHL originated and acquired residential mortgage loans. CB was a federally chartered savings bank, the deposits of which were federally insured. CSC was a registered broker-dealer that was engaged in underwriting RMBS, which were often backed by "pools" of loans originated by CHL. CFC, CHL, CB, and CSC are referred to herein collectively as "Countrywide."

> "As discussed below, from 2005 to 2007, Countrywide originated an increasing number of loans as exceptions to its Loan Program Guides. At the same time, employees of Countrywide received information indicating that there was an increased risk of poor performance for certain mortgage programs and products that were being included in RMBS. Despite having access to this information, Countrywide's RMBS offering documents generally did not disclose the extent to which underlying loans were originated as exceptions to its Loan Program Guides. Nor did Countrywide disclose in its RMBS offering documents the results of certain reviews and internal reports related to loan performance."

5

# "I. Countrywide Business Model "

"Between 2005 and 2007, Countrywide was a diversified financial services company engaged in mortgage lending, banking, mortgage loan servicing, mortgage warehouse lending, securities, and insurance. At this time, Countrywide was among the largest originators of residential mortgage loans in the United States. Countrywide's SEC filings show that it originated $229 billion in residential mortgage loans in 2005, $243 billion in 2006, and $205 billion in 2007."

"Countrywide's business model was to serve as an intermediary between borrowers seeking residential mortgages and investors seeking to purchase loans in the secondary market. As disclosed in Countrywide's Form 10-K for 2005, most of the mortgage loans Countrywide produced were sold into the secondary mortgage market, primarily in the form of RMBS. From 2005 to 2007, Countrywide sponsored and sold approximately $332 billion of prime, Alt-A, second lien, home equity line of credit, and subprime RMBS backed by loans originated by, among others, CHL."

"Countrywide employed, among others, a corporate strategy sometimes referred to as the "Supermarket Strategy." The Supermarket Strategy was developed to create a one-stop shopping experience for borrowers. In addition to offering its own products, Countrywide strove to offer to borrowers every kind of mortgage product that was available from legitimate competing lenders. A component of the Supermarket Strategy, which has sometimes been referred to as the "matching strategy," was a process by which Countrywide would learn about and evaluate loan product offerings from its competitors and expand its product offering to match or exceed its competitors' product offerings."

# "II. Countrywide Loan Origination Process"

"CHL originated and acquired residential mortgage loans through a variety of channels, including its own retail branches, mortgage brokers, and a network of third-party correspondent lenders. Countrywide's retail branches were referred to as the Consumer Markets Division ("CMD") and the Full Spectrum Lending Division ("FSL"). Countrywide provided its CMD and FSL branch underwriters with sets of lending guidelines, including Loan Program Guides, that listed borrower and loan characteristics, including credit scores and debt-to-income ("DTI") and LTV ratios, that branch underwriters were to consider when underwriting a potential loan. Branch underwriters had authority to approve loans that fit within the parameters outlined in the Loan Program Guides."

"When branch underwriters received loan applications that did not meet the program parameters in the Loan Program Guides (*e.g.*, credit score, LTV, loan amount), the branch underwriters were authorized to refer the applications to more experienced underwriters at the relevant divisional "Structured Loan Desk" ("SLD") for consideration of an "exception." Underwriters at the SLD were authorized to approve requests to make an "exception" to the Loan Program Guides if the proposed loan and borrower complied with the characteristics described in another set of guidelines, referred to as so-called

"Shadow Guidelines," and the loan contained compensating factors supporting the exception request."

8) It is in the "Shadow Guidelines" that BOA match two other loan offerings of other institutions and induced financial contracts using deceptive practices that were ongoing and continued until the sale of the mortgages at issue, and this event without attempt to comply with dealing with the first and second loan was a deceptive practice open to further discovery in this matter, but for the prospects of settlement.

9) On page 29&30 of the Statement of Facts Annex 1 to the SA it is stated:

### "COUNTRYWIDE AND BANK OF AMERICA – "PIGGYBACK LOANS""

"From at least 2006 through 2013, Countrywide Financial Corporation, Countrywide Home Loans, Inc., Countrywide Bank, FSB, First Franklin Financial Corp., and Bank of America, N.A. (collectively, "Bank of America") originated residential mortgage loans and sold certain of them to Fannie Mae and Freddie Mac. Among the loans that were originated were "Piggyback Loans," *i.e.*, multiple residential mortgage loans made to the same borrower at the same time on the same property and which are subject to the same or similar representations and warranties. Given the nature of the representations and warranties made with respect to each loan, if one of the two Piggyback Loans is found to be defective or otherwise subject to repurchase, the other frequently will be as well."

"Bank of America sold first lien loans from piggyback transactions to Fannie Mae and Freddie Mac and sold such first and second lien loans to RMBS trusts. In selling residential mortgage loans to the GSEs, representations and warranties were made to the GSEs that the loans complied in all respects with the standards outlined in the GSE selling guides and sales contracts, which set forth underwriting, documentation, quality control, and self-reporting requirements. Specifically, loans sold to Fannie Mae are sold with the representations and warranties contained in its Single Family Selling Guide (the "Fannie Guide") and the applicable purchase contracts, including in the case of Countrywide the Strategic Alliance Agreements entered into between Fannie Mae and Countrywide. Loans sold to Freddie Mac are sold with the representations and warranties contained in its Single-Family Seller/Servicer Guide (the "Freddie Guide") and purchase contracts."

"Bank of America made representations and warranties to Fannie Mae concerning each residential mortgage loan that they originated and sold to Fannie Mae, including but not limited to, the following:"

"

1. The mortgage conformed to all the applicable requirements in the Fannie Guide and the purchase contracts;
2. The mortgage was an "acceptable investment";
3. All required loan data was true, correct, and complete;

7

4. Automated underwriting conditions were met for loans processed through an automated underwriting system; and
5. No fraud or material misrepresentation was committed by any party, including the borrower."

"Bank of America was also generally required to self-report to Fannie Mae and Freddie Mac any loans it identified as defective and/or otherwise ineligible for sale to the GSEs. When purchasing or providing reimbursement for a second lien mortgage that violated its representations and warranties, Bank of America did not regularly review the corresponding first lien mortgage loan that had been sold to Fannie Mae and Freddie Mac to determine whether it was required to self-report that loan, and typically did not self-report the related first lien mortgage loan."

10) New York General Business Law 349 states:

(a)"Deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are hereby declared unlawful."

(b) "In addition to the right of action granted to the attorney general pursuant to this section, any person who has been injured by reason of any violation of this section may bring an action in his own name to enjoin such unlawful act or practice, an action to recover his actual damages or fifty dollars, whichever is greater, or both such actions. The court may, in its discretion, increase the award of damages to an amount not to exceed three times the actual damages up to one thousand dollars, if the court finds the defendant willfully or knowingly violated this section. The court may award reasonable attorney's fees to a prevailing plaintiff."

11) For the foregoing reasons, it is clear justice in this matter cannot be had until such time as BOA and CHL either settles on its own accord as presented or similar to same effect, or be ordered to 1) state whether or not the financial documents and records related to the issuance and servicing of these mortgages subject matter herein is included in the SA.

12) Being determined that said financial matters at issue are part of the subject matter of the SA, let CHL and BOA show that said conduct in their respective administration of said mortgages was legal and consistent with the intent of the SA.

Respectfully Submitted:

*[signature]*
REBECCA MARRERO GEBMAN
2 WILSON STREET
BEACON, NY 12508
212-696-3888

*[handwritten note from judge:]* Two wrongs don't make a right, so BOA's failure to appear on 4/12/17 doesn't mean it's okay for Plaintiff to not appear on 6/5/17. Nor do I see how that proceeding was "constructively cancelled." If Plaintiff wishes to defend this case, she must follow the scheduling order entered on 6/5/17. She can order the transcript if she wants to know why her counterclaims were dismissed.

So Ordered.

*[signature]*
Cathy Seibel, U.S.D.J.

Dated: 6/26/17